UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

SUZANNE KAYE,

Plaintiff,

Case No. ______________________

v.

UNITED STATES OF AMERICA,

Defendant.
_____________________________________/

**COMPLAINT**

Plaintiff Suzanne Kaye, through undersigned counsel, sues Defendant United States of America and alleges:

**INTRODUCTION**

1. This is a civil action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1) and 2671–2680, for malicious prosecution and abuse of process. It arises from the investigation, arrest, and prosecution of Ms. Kaye—a retiree living in a senior residential community in Boca Raton, Florida—for two short videos that she posted to social media on January 31, 2021.

2. In the videos, which she staged as a scripted bit using a bottle of whiskey as a prop, she addressed her fellow supporters of President Donald J. Trump—her "TikTok Patriot friends"—and retold, for what she described at trial as "shock value," a telephone call from a man who said he was an FBI agent, who claimed he was investigating whether she had been at the United States Capitol on January 6, 2021—she had not, and told the FBI agent the same—all of which she later learned was based on an online tip that Ms. Kaye "may have been at the

Captiol." In the videos, she used profanity. She criticized the FBI for its treatment of Lieutenant General Michael T. Flynn. She invoked her rights to counsel, to free speech, and to bear arms. She said in the first video posted to Facebook:

> Hello my TikTok Patriot friends. Gotta have a drink. Just got a call from the FBI. They want to come talk to me about my visit to DC on January 6th. I told them: You can't come and talk to me unless I have counsel. And being that I can't afford counsel, you'll have to arrest me so I can use my right of counsel. You guys just spent four years persecuting a three-star general with no evidence. You think I'm gonna let you come fucking talk to me. You're out your motherfucking mind, bro. That's not gonna happen. I'm a fucking patriot. And I exercise my First Amendment right on my freedom of speech, and my Second Amendment right to shoot your fucking ass if you come here.

In the second video, posted to Instagram, she said:

> …friends. I'm here to let you know I need a drink. [Drinks from the whiskey bottle]. Just got a call from the FBI. They want to come talk to me about my visit to DC on January 6th. I told them: Bro, I ain't gonna talk to you unless I have counsel. And being that I can't afford counsel right now, you're gonna have to arrest me so I can exercise my right to counsel. And being that you don't even know where I live and you have to ask me, I ain't talking to you either. You just spent four years persecuting a three-star general with no evidence. You think I'm gonna let you come talk to me? I'm an American. I know my fucking rights. My First Amendment right to free speech. My Second Amendment right to carry a gun, to shoot your fucking ass if you come to my house. So fuck you. Fuck you following me. I don't fucking care. I'm glad you know who I am, motherfucker.

3. Ms. Kaye did not send the videos to the FBI. She did not "tag" the FBI or any agent, although there were various ways to do so. She did not otherwise direct the videos to any agent's attention. The FBI had no evidence that Ms. Kaye had been in Washington, D.C. on January 6, 2021, which was the subject of the tip that first brought her to the FBI's attention. On February 2, 2021, the case agent and his supervisor decided to "just close the lead down."

4. Then, on February 8, 2021, the same tipster sent the FBI a second tip, attaching one of the social media videos. This tip was sent less than a week after two FBI agents were shot

and killed during a warrant operation in Broward County. Given the recent shootout and although no officer ever entered or searched Ms. Kaye's home for a firearm or anything else, an FBI agent swore out a criminal complaint and obtained a warrant for Ms. Kaye's arrest on the basis that her social media video—in which she said that if FBI agents came to her house she would exercise her Second Amendment rights—was a threat to inflict violence against FBI agents. On February 17, 2021, ten to fifteen armed law enforcement personnel, including FBI SWAT officers carrying long guns, arrested Ms. Kaye, an unarmed and cooperative woman with epilepsy, as she walked her dog in her neighborhood.

5. Ms. Kaye was charged with two counts of violating 18 U.S.C. § 875(c), one for each of two nearly identical videos. After a three-day trial, the jury acquitted her on Count One and convicted her on Count Two. The district judge had predicted before trial that a jury would not split on two videos that were so alike. When the verdict came in, the government explained the difference by saying that the second video was more vulgar than the first. Ms. Kaye was sentenced to 18 months in prison. She served about eleven months in the custody of the Bureau of Prisons, during which she suffered repeated seizures and emergency hospitalizations, including intubations that left her with permanent injury to her trachea and voice.

6. On November 14, 2025, President Trump granted Ms. Kaye a full and unconditional pardon. Pardon Attorney Ed Martin categorized Ms. Kaye's prosecution as "DOJ Weaponization," and that Ms. Kaye had been "targeted" by the Department of Justice for her social media posts.

7. This lawsuit seeks accountability and damages from the United States for wrongs committed against Ms. Kaye through its investigative and law enforcement officers. Ms. Kaye's claims rest on the acts and omissions of FBI special agents and supervisors who initiated,

procured, and continued a criminal prosecution that lacked probable cause and was motivated by malice, and who used criminal process against her for purposes other than those for which it exists.

## PARTIES

8. Plaintiff Suzanne Kaye is an individual who resides in Rancho Mirage, California. At the time of the events alleged in this Complaint, Ms. Kaye resided in Palm Beach County, Florida.

9. Defendant United States of America is sued under the FTCA for the torts of its employees, including the employees of the FBI and the Department of Justice ("DOJ"), committed while acting within the scope of their employment.

## PRIMARY WRONGDOERS

10. References in this Complaint to actions of the Federal Bureau of Investigation ("FBI"), the DOJ, or the United States Attorney's Office for the Southern District of Florida ("USAO") include the actions of their officers, employees, and agents, whether known or unknown to Ms. Kaye at this time.

11. Special Agent Arthur Smith was at all relevant times an FBI special agent assigned to the FBI's West Palm Beach office. Agent Smith was assigned to investigate Ms. Kaye and was the FBI's case agent on the matter. He placed the calls to Ms. Kaye, went to her address, prepared a search warrant, swore to it, obtained the warrant for her arrest, and testified for the government at her trial.

12. Special Agent Kaitlin L. Marsh was at all relevant times an FBI special agent assigned to the FBI's West Palm Beach office. Agent Marsh was assigned to investigate Ms. Kaye. Agent Marsh swore to the criminal complaint against Ms. Kaye.

13. Special Agent Matthew Gastony was at all relevant times an FBI special agent assigned to the FBI's West Palm Beach office. Agent Gastony was assigned to investigate Ms. Kaye and went to her home with Agent Smith.

14. Agent Smith's supervisors were at all relevant times Paul G. Allen and Katrice Stubbs, the supervisory special agents in the FBI's West Palm Beach office. The supervisors approved Agent Smith's opening of a full investigation into Ms. Kaye's videos.

15. The FBI special agents named or described in paragraphs 11 through 13 and other FBI personnel whose identities are presently unknown are referred to collectively as the "FBI Officers."

16. Each FBI Officer was, at all relevant times, an employee of the United States acting within the scope of his or her employment and was an "investigative or law enforcement officer" within the meaning of 28 U.S.C. § 2680(h), that is, an officer of the United States empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law. *See* 18 U.S.C. § 3052.

17. While USAO personnel may be referenced in the complaint, Ms. Kaye's claims are based on the acts and omissions of the FBI Officers, including their acts and omissions in initiating and procuring the prosecution, in supplying the information on which the prosecutors acted, in pressing for and supporting its continuation, and in using criminal process against Ms. Kaye. Ms. Kaye does not seek in this action to hold the United States liable for the charging or advocacy decisions of prosecutors.

**JURISDICTION, VENUE, AND EXHAUSTION**

18. This Court has original subject-matter jurisdiction over this action under 28 U.S.C. § 1346(b)(1), which gives the district courts exclusive jurisdiction over civil actions against the United States for money damages for personal injury caused by the wrongful acts or

omissions of federal employees acting within the scope of their employment, under circumstances in which a private person would be liable in accordance with the law of the place where the act or omission occurred. The claims here arise from acts and omissions of investigative or law enforcement officers and are therefore within the waiver of sovereign immunity in the proviso to 28 U.S.C. § 2680(h).

19. Venue is proper in this District because the acts and omissions complained of occurred in this District. The FBI's investigation was conducted from its West Palm Beach office; Ms. Kaye was arrested in Palm Beach County; and the prosecution was brought and tried in this Court. The West Palm Beach Division is the proper division because the events occurred in Palm Beach County.

20. Because the acts and omissions complained of occurred in Florida, the substantive law of Florida governs the United States' liability. 28 U.S.C. § 1346(b)(1).

21. Ms. Kaye has exhausted her administrative remedies under 28 U.S.C. § 2675(a). On March 31, 2026, Ms. Kaye presented her administrative claim, on Standard Form 95 with an attached supplement and declaration, to the DOJ, the FBI, and the USAO. The claim was received on April 8, 2026, as set forth in a written acknowledgment letter from DOJ, as the lead agency, dated May 14, 2026. From the government's receipt on April 8, 2026, more than six months have passed without a final disposition, and the claim is therefore deemed finally denied.

22. This action is timely under 28 U.S.C. § 2401(b). Ms. Kaye's claims accrued no earlier than November 14, 2025, when the criminal proceedings against her terminated in her favor, and she presented her administrative claim within two years of that date.

23. The damages sought in this action do not exceed the amount presented in Ms. Kaye's administrative claim.

24. The United States has waived immunity for the claims below, and its liability is not barred by the discretionary function exception, 28 U.S.C. § 2680(a). FBI Officers have no discretion to arrest or cause the prosecution of a person for constitutionally protected speech without probable cause, to swear out a criminal complaint lacking probable cause, or to use criminal process to punish a person for her political expression.

## FACTUAL BACKGROUND

25. In January 2021, Ms. Kaye was a 59-year-old retiree living in a senior residential community in Boca Raton, Florida. She lived with one of her two adult children and with her service dog. She required the service dog because, among other medical conditions, she suffers from epileptic seizures, which she treated with medical marijuana.

26. Ms. Kaye testified at her criminal trial in June 2022 that she became interested in politics during the 2016 presidential election cycle. She had been a member of the Democratic Party, but after meeting supporters of the MAGA movement and researching their views for herself, she concluded that those views were valid. She registered as a Republican and voted for Donald Trump in 2020. Asked to describe her political views at trial, she testified: "I am MAGA."

27. Ms. Kaye described MAGA as "putting America first, America's people, America's citizens, America's interests above all others and all else first." She testified that she believed the government had failed in that respect and that the government "should have a very limited role in your life, in the pursuit of your life, liberty and happiness." She described herself as a "[c]onstitutional purist." She believed the First Amendment guarantees "the freedom of speech to spark thought, collective debate, different opinions, and curiosity," and that the Second Amendment gives people "the right to defend themselves and their property and their families."

28. In addition to serving as a poll worker in the 2020 election, Ms. Kaye became politically active on social media. Under the TikTok username "Angry Patriot Hippie," she tried to "get famous" online by attracting like-minded followers. She explained the name at trial: she was "angry" about what was happening in the country; she was a "patriot" because she was "an American, first and foremost" who "believe[d] in my country"; and she was a "hippie" because she was "cannabis friendly." In December 2020, she posted for fellow "patriots" who, like her, believed that the results of the presidential election should be challenged. Her posts were attracting followers.

**A. The Tip and the FBI's Contact with Ms. Kaye**

29. On January 16, 2021, ten days after the events at the U.S. Capitol on January 6, 2021, the FBI's National Threat Operations Center received a tip about Ms. Kaye. The tip was referred to the FBI's West Palm Beach office.

30. On January 21, 2021, Agent Smith was assigned to interview Ms. Kaye. His supervisor told him that an online tip indicated that Ms. Kaye "may have been at the Capitol" and "may have some information about the events that occurred at the Capitol on January 6th." Agent Smith's assignment was to determine whether Ms. Kaye had been there and what information she had.

31. On January 28, 2021, Agent Smith went to Ms. Kaye's last known address and learned that she no longer lived there. He then called her last known telephone number. Ms. Kaye answered. Agent Smith identified himself and said he was calling to talk to her about her travel to Washington, D.C. on January 6.

32. Ms. Kaye told Agent Smith that she had not been in Washington on January 6, and she asked whether he had any proof. Agent Smith answered that this was why he wanted to

speak with her. At trial, Agent Smith testified that the FBI had no evidence that Ms. Kaye had been in Washington, D.C. on January 6, 2021.

33. Ms. Kaye told Agent Smith that she was retired and did not drive, but that he was welcome to come to her home, and she gave him her address. The conversation lasted about a minute. Ms. Kaye was "cooperative" and "pleasant." Agent Smith told her he would come that same afternoon. He was ultimately unable to do so. He called back and left a voicemail, but Ms. Kaye testified that she did not receive it, and there was no evidence that she did.

34. Although Agent Smith had not told Ms. Kaye that his inquiry was over, no appointment to meet with her was pending. When no one came, Ms. Kaye concluded that the call had been a "joke" by someone from social media. She assumed that a real FBI agent would already know where she lived, and because she had not been at the Capitol on January 6, she did not understand why the FBI would want to speak with her about it.

**B. The Social Media Posts**

35. The supposed prank gave Ms. Kaye an idea for a post to her social media accounts. On January 31, 2021, she executed it. Her target audience, she testified, was "[p]eople who didn't agree with the outcome of the 2020 election," or "ultra MAGA supporters."

36. Ms. Kaye wrote a script, staged it with props, and filmed it on her cell phone. There were multiple takes of the same script. The concept was to show a nervous person taking a swig of whiskey from a bottle and then retelling the story of the telephone call. Ms. Kaye testified that the retelling was a "parody" done for "shock value," that it was an "act" designed to gain followers, and that she did not intend to threaten the FBI.

37. The first video, posted to Facebook, ran about 50 seconds and was titled "Fuck the FBI." It said in full:

> Hello my TikTok Patriot friends. Gotta have a drink. Just got a call from the FBI. They want to come talk to me about my visit to DC on January 6th. I told them: You can't come and talk to me unless I have counsel. And being that I can't afford counsel, you'll have to arrest me so I can use my right of counsel. You guys just spent four years persecuting a three-star general with no evidence. You think I'm gonna let you come fucking talk to me. You're out your motherfucking mind, bro. That's not gonna happen. I'm a fucking patriot. And I exercise my First Amendment right on my freedom of speech, and my Second Amendment right to shoot your fucking ass if you come here.

38. The second video, posted to Instagram within seconds of the first, ran about 58 seconds. Because Ms. Kaye was working from the same script, it was very similar, though there were slight differences in language and her delivery was angrier in tone. It said in full:

> …friends. I'm here to let you know I need a drink. [Drinks from the whiskey bottle]. Just got a call from the FBI. They want to come talk to me about my visit to DC on January 6th. I told them: Bro, I ain't gonna talk to you unless I have counsel. And being that I can't afford counsel right now, you're gonna have to arrest me so I can exercise my right to counsel. And being that you don't even know where I live and you have to ask me, I ain't talking to you either. You just spent four years persecuting a three-star general with no evidence. You think I'm gonna let you come talk to me? I'm an American. I know my fucking rights. My First Amendment right to free speech. My Second Amendment right to carry a gun, to shoot your fucking ass if you come to my house. So fuck you. Fuck you following me. I don't fucking care. I'm glad you know who I am, motherfucker.

39. The same video was also posted to Ms. Kaye's TikTok account, with a version of the song "Every Breath You Take" playing in the background. Ms. Kaye explained at trial that she chose the song as the "hook to the video" because the FBI was "watching me" and could be watching her followers too.

40. The videos were public. Ms. Kaye did not tag the FBI or otherwise direct the videos to the FBI's attention, although there were various ways to do that. Nothing in the videos identified any agent by name, and nothing in them said that Ms. Kaye would go anywhere, seek

out anyone, or take any action against anyone. The only circumstance the videos described was the one in which an FBI agent came to her house after she had said she would not speak to the FBI without counsel.

**C. The FBI's Response**

41. Unaware of the videos, Agent Smith went to Ms. Kaye's address, unannounced, on February 2, 2021. No one answered the door, and it was unclear whether anyone was home. He called Ms. Kaye. She did not answer. Agent Smith and his supervisor then decided to "just close the lead down." At that point, the FBI had no evidence that Ms. Kaye had been in Washington, D.C. on January 6, 2021, or that she had any information about the events at the Capitol.

42. That same day, two FBI agents were shot and killed and three others were injured during a warrant operation at an apartment complex in Sunrise, Florida.

43. The shootings marked one of the bloodiest days in FBI history in South Florida and among the deadliest nationally as well, according to the FBI website.

44. Less than a week later, on February 8, 2021, the FBI's National Threat Operations Center received a second tip about Ms. Kaye. It was from the same tipster, but this time it concerned supposed threats to the FBI, and it attached a video she posted to Facebook. NTOC sent the tip to the West Palm Beach office with priority status.

45. On February 9, 2021, Agent Smith's supervisor emailed him the video. Agent Smith and the supervisor each perceived the video to be a serious threat to shoot Agent Smith if he came to Ms. Kaye's house.

46. At that point, Agent Smith knew or should have known that: (a) Ms. Kaye had been cooperative and pleasant when he spoke with her, had given him her address, and had

invited him to come to her home; (b) the FBI had no evidence linking her to the events of January 6; (c) the FBI had itself just decided to close the lead; (d) the video was framed as a retelling of the call and addressed to Ms. Kaye's social-media followers; (e) the video did not identify or address any agent by name and had not been sent or tagged to the FBI; and (f) the video's reference to shooting was in reference to Ms. Kaye speaking about her Constitutional rights to free speech and bear arms, and couched as exercising her Second Amendment rights if someone came to her home. Importantly, the Second Amendment does not give you the right to shoot whomever you want just because they are at your home.

47. Even so, on February 15, 2021, Agent Marsh prepared a criminal complaint and with Agent Smith obtained a warrant for Ms. Kaye's arrest. The affidavit omitted that the FBI had no evidence Ms. Kaye was in Washington on January 6; that the lead had been closed on February 2; and that the videos were not sent or tagged to the FBI. Also compare the affidavit's account of the January 28 call and of the reason the FBI contacted her against Agent Smith's trial testimony.

48. Instead, the entire process was undertaken because of the recent attacks on FBI agents in Sunrise, Florida and based on animosity toward Ms. Kaye related to her political speech and support for the events at the Capitol on January 6, 2021.

49. The next day, February 16, 2021, FBI personnel surveilled Ms. Kaye and held an operational meeting to plan how to execute the arrest.

50. On February 17, 2021, at about 10:00 a.m., ten to fifteen armed law enforcement personnel, including FBI SWAT officers armed with long guns, arrested Ms. Kaye while she was walking her dog in her neighborhood. Ms. Kaye was unarmed and cooperative. Her son, who came outside to retrieve the dog, was also cooperative.

51. At no time did any officer attempt to enter or search Ms. Kaye's home, whether to look for firearms or to collect into evidence.

52. During the ensuing investigation, Agent Smith learned that a second video had been posted on Instagram that was "slightly different from the first," "shot at a different angle" and possibly with "a different tone." The two videos were so similar that Agent Smith had initially believed they were the same. Both were available for public viewing at the time of Ms. Kaye's arrest.

**D. The Prosecution, Conviction, Imprisonment, and Pardon**

53. Ms. Kaye was charged by complaint and then by indictment in *United States v. Kaye*, No. 9:21-cr-80039 (S.D. Fla.). A superseding indictment charged two counts of transmitting a threat in interstate commerce in violation of 18 U.S.C. § 875(c), one count for each of the two videos posted to Facebook and Instagram.

54. Before trial, the district court asked the government why it was superseding the indictment to add the second count, and predicted that "[t]he jury is not going to find her guilty as to one of the videos and not guilty on the other."

55. After a three-day trial at which Agent Smith testified for the government, the jury acquitted Ms. Kaye on Count One and convicted her on Count Two. Ms. Kaye moved for a mistrial on the ground that the verdict was inconsistent. The government answered that the verdict was not inconsistent because the second video was more vulgar than the first. The district court agreed and denied the motion.

56. The government's explanation confirms that the difference between the video for which Ms. Kaye was acquitted and the video for which she was convicted was not that one contained a threat and the other did not, but that one used cruder language. Vulgarity, profanity,

and contempt for federal law enforcement are protected by the First Amendment.

57. After the verdict, during a hearing on whether Ms. Kaye would remain on bond pending sentencing, Ms. Kaye suffered a massive seizure in open court. A 911 call was made, and Fire/Rescue transported her to the hospital. Her defense attorney later stated under oath that Ms. Kaye had no pulse at the time. Due in part to her medical condition, the district court found "extraordinary circumstances" warranting her continued release on bond.

58. The court continued sentencing more than once because of Ms. Kaye's medical circumstances. The court sentenced Ms. Kaye to 18 months in prison, a downward variance from a guideline range of 27 to 33 months, calculated with zero criminal history points.

59. Ms. Kaye appealed to the Eleventh Circuit on April 24, 2023. *United States v. Kaye*, No. 23-11423 (11th Cir.). The district court denied her motion to remain on bond pending appeal. On July 13, 2023, Ms. Kaye voluntarily surrendered to the Bureau of Prisons ("BOP") to begin serving her sentence.

60. Ms. Kaye was remanded to BOP custody on assurances that BOP would see that her medical conditions were well monitored and treated. Nevertheless, while in BOP custody she suffered repeated seizures and other medical problems, received inadequate mental-health treatment, and required emergency hospitalizations, including intubations.

61. On February 14, 2024, almost three years after her arrest, the Eleventh Circuit affirmed the judgment. Ms. Kaye's petition for a writ of certiorari, *Kaye v. United States*, No. 23-6840, was denied on April 1, 2024. Ms. Kaye was released from BOP custody on June 7, 2024.

62. On November 14, 2025, President Trump granted Ms. Kaye a full and unconditional pardon for her offense.

63. The pardon was not the product of any compromise, settlement, bargain, or payment by or on behalf of Ms. Kaye, and Ms. Kaye gave the United States nothing in exchange for it. The pardon did not rest on any technical, procedural, or jurisdictional ground. It followed the exhaustion of Ms. Kaye's direct appeal and her service of her sentence, and it reflected the Executive Branch's determination that the prosecution should never have been brought.

64. The criminal proceedings against Ms. Kaye therefore terminated in her favor, in a manner that reflects on the merits of the charge and not on any procedural or technical ground, when the President granted the pardon on November 14, 2025.

**THE ABSENCE OF PROBABLE CAUSE AND OFFICERS' MALICE**

65. When FBI Officers swore out the criminal complaint on February 15, 2021, and at every later stage at which the FBI Officers continued to support the prosecution, no reasonable officer in their position could have believed that Ms. Kaye had committed a violation of 18 U.S.C. § 875(c).

66. Section 875(c) reaches only a true threat, that is, a communication that a reasonable person would understand as a serious expression of an intent to commit an act of unlawful violence, made with a culpable mental state. Hyperbole, parody, political rhetoric, and crude and offensive language directed at government officials are protected speech.

67. Nothing in what the FBI Officers knew would have led a reasonable officer to conclude that Ms. Kaye's videos were a true threat rather than a political performance. The videos were addressed to Ms. Kaye's followers, not to any agent. They were staged with a prop and a script. They were not sent to the FBI, tagged to the FBI, or otherwise brought to the FBI's attention by Ms. Kaye. They named no agent. They described a conditional response to a hypothetical visit that Ms. Kaye had, in the FBI's own experience, welcomed. And the only person who had ever spoken to Ms. Kaye described her as cooperative and pleasant.

68. The FBI Officers' own conduct shows that they did not believe Ms. Kaye posed a danger. The FBI closed the lead on February 2, 2021. After receiving the video, the FBI took six days to obtain an arrest warrant and two more days to arrest Ms. Kaye. The FBI surveilled her. No officer sought to enter or search her home or look for a firearm.

69. Instead, the entire process was a response to (i) Ms. Kaye's political identity and speech and (ii) a reaction to the very recent killing of two FBI agents in Sunrise, Florida.

70. Any presumption of probable cause that might otherwise arise from the indictment, the verdict, or the affirmance on appeal is rebutted because the FBI Officers procured those proceedings by presenting the video and Ms. Kaye's circumstances in an incomplete and misleading way and by withholding facts that they knew undermined any inference of a true threat.

71. The FBI Officers also acted with malice, that is, primarily for a purpose other than bringing an offender to justice. Malice may be inferred from the absence of probable cause, and the circumstances here support that inference.

72. On information and belief, the FBI Officers were motivated at least in part by hostility to Ms. Kaye's expression, particularly just following the events at the Capitol on January 6, 2021: her public contempt for the FBI, her criticism of the FBI's treatment of General Flynn and support for Donald Trump, and her identification with a political movement that the FBI Officers regarded with disfavor.

## MS. KAYE'S INJURIES

73. As a direct and proximate result of the wrongful conduct alleged above, Ms. Kaye was arrested by a tactical team armed with long guns, prosecuted for more than three years, convicted, and imprisoned for approximately eleven months, causing emotional damages.

74. After the verdict, Ms. Kaye suffered a massive seizure that required emergency medical intervention and hospitalization. While in BOP custody she suffered repeated seizures and other medical problems, lacked adequate mental-health treatment, and required hospitalization, including emergency intubations.

75. Ms. Kaye has suffered and continues to suffer severe emotional distress, including loss of sleep, nightmares, and anxiety. She has been diagnosed with anxiety, post-traumatic stress disorder, bipolar disorder, and depression.

76. Ms. Kaye has suffered permanent physical injuries, including trauma to the trachea and changes to her voice resulting from intubation while in custody.

77. Ms. Kaye also suffered the loss of her liberty, humiliation, damage to her reputation as a result of being publicly charged with and convicted of threatening federal law enforcement officers, the loss of rights and privileges that attend a felony conviction, and pain and suffering.

**COUNT I**
**MALICIOUS PROSECUTION**

78. Ms. Kaye realleges and incorporates by reference paragraphs 1 through 77 as if fully set forth herein.

79. Under the FTCA, "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, ...." 28 U.S.C. § 2674. A private person who instigated or continued a baseless criminal prosecution against another would be liable for malicious prosecution under Florida law.

80. To establish malicious prosecution under Florida law, a plaintiff must show that: (1) an original criminal or civil judicial proceeding against the plaintiff was commenced or

continued; (2) the defendant was the legal cause of that proceeding; (3) the proceeding terminated in a bona fide termination in the plaintiff's favor; (4) there was an absence of probable cause for the proceeding; (5) there was malice on the part of the defendant; and (6) the plaintiff suffered damage as a result. *Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1355 (Fla. 1994).

81. An original judicial proceeding was commenced against Ms. Kaye by the criminal complaint sworn on February 15, 2021, and continued by the indictment, the superseding indictment, the trial, the judgment and sentence, and the appeal, in the matters identified above.

82. The United States, through the FBI Officers, was the legal cause of that proceeding. FBI Officers prepared and swore to the criminal complaint and obtained the arrest warrant. The FBI Officers were the source of the information on which the prosecutors acted; they framed the video as a serious threat; and they continued to investigate, to support, and to give testimony in support of the prosecution through trial. The decision to prosecute was not independent of the FBI Officers' influence, pressure, and presentation of the facts. Their acts and omissions form an unbroken chain of causation from the FBI's revival of a closed lead to Ms. Kaye's conviction and imprisonment.

83. The proceeding terminated in Ms. Kaye's favor on November 14, 2025, upon the full and unconditional pardon described above, which was not obtained by compromise or bargain and which did not rest on any technical or procedural ground.

84. As alleged in above, there was no probable cause for the criminal complaint, the indictments, or the continued prosecution of Ms. Kaye.

85. As alleged above, the FBI Officers acted with malice.

86. Ms. Kaye suffered physical injuries, emotional damages, and loss of liberty as a

direct and proximate result of the FBI Officers' actions.

87. The FBI Officers committed the acts and omissions alleged in this count while acting within the scope of their employment as investigative or law enforcement officers of the United States.

88. The United States is therefore liable to Ms. Kaye for malicious prosecution in an amount to be determined at trial.

**COUNT II**
**ABUSE OF PROCESS**

89. Ms. Kaye realleges and incorporates by reference paragraphs 1 through 77 as if fully set forth in this Count.

90. To establish abuse of process under Florida law, a plaintiff must show that: (1) the defendant made an illegal, improper, or perverted use of process; (2) the defendant had an ulterior motive or purpose in exercising that illegal, improper, or perverted use of process; and (3) as a result, the plaintiff suffered damage. *Hardick v. Homol*, 795 So. 2d 1107, 1111 n.2 (Fla. 5th DCA 2001) (citing *Thomson McKinnon Sec., Inc. v. Light*, 534 So. 2d 757, 760 (Fla. 3d DCA 1988)).

91. The FBI Officers obtained and used the criminal complaint and the warrant for Ms. Kaye's arrest, and caused and used the indictments and the conditions of her pretrial release, all of which are judicial process.

92. The FBI Officers used that process for ends for which it was not intended and in a manner that was not proper in the regular prosecution of a charge. Criminal process exists to bring persons who have committed crimes before a court. The FBI Officers used it, after it issued, to punish Ms. Kaye for her political speech and her public contempt for the FBI; and to send a message to Ms. Kaye's followers, and others like them, that criticism of the FBI would be

met with arrest and prosecution.

93. The FBI Officers' purposes were ulterior. They were not to vindicate the interest of the United States in punishing a genuine threat, which the FBI Officers did not believe existed, but to punish and chill protected expression and to obtain from Ms. Kaye what the FBI's closed inquiry had not.

94. As a direct and proximate result of these abuses of process, Ms. Kaye suffered physical injuries, emotional damages, and loss of liberty.

95. The FBI Officers committed the acts and omissions alleged in this count while acting within the scope of their employment as investigative or law enforcement officers of the United States. This Count rests on their acts and omissions, and not on the conduct of prosecutors.

96. The United States is therefore liable to Ms. Kaye for abuse of process in an amount to be determined at trial.

## PRAYER FOR RELIEF

Ms. Kaye respectfully requests that the Court enter judgment in her favor and against the United States of America and award the following relief:

a. compensatory damages, including damages for loss of liberty, physical injury, pain and suffering, emotional distress, humiliation, and injury to reputation, in an amount to be determined at trial and not to exceed the amount set forth in her timely addressed tort claim notice;

b. costs of this action as permitted by law;

c. post-judgment interest as permitted by law; and

d. such other and further relief as the Court deems just and proper.

Dated: October 13, 2026

Respectfully submitted,

*/s/ James M. Slater*
James M. Slater (FBN 111779)
Slater Legal PLLC
9000 Dadeland Boulevard #1500
Miami, Florida 33156
Tel. (305) 523-9023
james@slater.legal

*Attorneys for Plaintiff Suzanne Kaye*